UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SALVATORE MAZZOLA,

        Plaintiff,                  Case No. 2:16-cv-11549
                                   Chief Judge Denise Page Hood
v.                               Magistrate Judge Anthony P. Patti

WILLIAM S. OVERTON,
PATRICIA CARUSO, HEIDI
WASHINGTON, RANDALL
HAAS and JOHN DOE(S),

        Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT DEFENDANTS'
OVERSON, CARUSO, WASHINGTON AND HAAS'S MOTION FOR
SUMMARY JUDGMENT (DE 27)**

I.    **RECOMMENDATION:** The Court should **GRANT** Defendants

Washington, Caruso, Overton and Haas's December 6, 2017 motion for summary

judgment.  (DE 27.)

II.    **REPORT**

    **A.**    **Introduction**

        Plaintiff filed the instant lawsuit via counsel on April 29, 2016 against

named and unnamed defendants.  (DE 1.)  On July 27, 2016, Plaintiff filed a first

amended complaint in which the named Defendants are Heidi Washington, Patricia

Caruso and William Overton (current and former Michigan Department of

Corrections (MDOC) Directors) and Randall Haas (a former Warden of the G. Robert Cotton Correctional Facility (JCF)).  (DE 7.)

Chief Judge Hood referred this case to me for pretrial matters, and a scheduling conference was held on October 6, 2017, at which counsel for all of the named parties appeared..  The scheduling order required that Plaintiff reformat his initial pleading and file a second amended complaint no later than October 20, 2017 and set December 6, 2017 as the deadline for all motions based on Fed. R. Civ. P. 12, exhaustion, immunity or any other jurisdictional basis.

### B.    Plaintiff's Second Amended Complaint

On October 20, 2017, Plaintiff filed a second amended prisoner civil rights complaint "for failure to protect and unconstitutional placement in punitive segregation" against the same named Defendants (Caruso, Overton, Washington and Haas), as well as several John and Jane Does.  (DE 25 at 2-3.)[1]  Plaintiff contends he "will amend [the] complaint to supply names of responsible parties once discovery has determined responsibility."  (DE 24 at 3 ¶ 7.)

The factual allegations underlying Plaintiff's second amended complaint begin with his December 22, 1994 transfer from the Saginaw Correctional Facility (SRF) to the Gus Harrison Correctional Facility (ARF), the simultaneous issuance of a Special Problem Offender Notice (SPON) naming two other prisoners, and a

---

[1] This is the latter of what appear to be duplicate filings, the earlier of which was docketed as an "answer."  (*Compare* DE 24, DE 25.)

June 5, 1995 stabbing at ARF.  (DE 25 at 4 ¶¶ 1-3.)  However, the crux of

Plaintiff's factual allegations stems from:  **(1)** a May 7, 2013 transfer from the

Kinross Correctional Facility (KCF) to JCF, in anticipation of a May 13, 2013

appointment at Allegiance Hospital; **(2)** an alleged May 31, 2013 assault at JCF;

and **(3)** Plaintiff's June 1, 2013 placement in "protective custody" at JCF.  (*Id.* at 5-

6 ¶¶ 8-12.)  Plaintiff was transferred from JCF to Lakeland Correctional Facility

(LCF) on June 19, 2013, after which he engaged the assistance of counsel.  (*Id.* at 7

¶¶ 14-16.)  (*See also* DE 25-3 at 18-27.)

### C.    Defendants' Motion for Summary Judgment

On December 6, 2017, Defendants Caruso, Haas, Overton and Washington

filed a motion for summary judgment.  (DE 27.)  In sum, Defendants argue that

Plaintiff's second amended complaint should be dismissed as to the claims against

them, because "the only two grievances he filed on the issues raised in the Second

Amended Complaint were rejected as untimely."  (*Id.* at 12-16.)  Plaintiff opposes

the motion and contends that "he was prevented from timely filing his grievance

due to circumstances beyond his control" and that "there were valid reasons for the

delay in filing his grievance."  (DE 28 at 19.)[2]

---

[2] The Court is perplexed by the format of Plaintiff's response.  Aside from the fact
that it is titled a "reply/traverse," (DE 28 at 1), it also dedicates many pages to the
merits of his deliberate indifference causes of action, including a detailed review of
MDOC PD 03.03.110 ("Special Problem Offender Notice") (*Id.* at 2-8, 18-19).
This is somewhat odd, as the *sole* issue in Defendants' present motion for

### D.    Fed. R. Civ. P. 56

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56.  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the

---

summary judgment is whether Plaintiff has properly exhausted his administrative remedies as to his claims against them.  (*See* DE 27 at 12-16.)  Then, after stating he "will address the issue of rejections of his grievances at the appropriate time[,]" Plaintiff provides a section titled, "Defendants' statement of facts, argument and controlling authority[.]"  (DE 28 at 8-10.)  Fast forward a few pages, and Plaintiff provides a summary of his complaint, which is prefaced by the statement that his verified complaint "has the strength of an affidavit and is evidence in a [response] to a motion for summary judgment."  (*Id*. at 13-16.)  Nonetheless, amidst these pages, Plaintiff does provide some exhaustion related arguments, each of which the Court has hopefully discerned and addressed below.

motion."). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The nonmoving party must "make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]here must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute.") (internal quotation marks and citations omitted).

Summary judgment is appropriate if the evidence favoring the nonmoving party is merely colorable or is not significantly probative. *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994). In other words, summary judgment is appropriate when "a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case. . . ." *Stansberry*, 651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

### E. Discussion

### 1.    Exhaustion

In Plaintiff's words, he files this complaint "alleging that the removal of the SPON naming prisoner #225120 Clemente Paul Pena from Plaintiff's transfer orders resulted in Plaintiff's transfer to a facility in which Pena resided, resulting in Plaintiff being viciously assaulted."  (DE 25 at 12 ¶ 40.)  Under the PLRA, a prisoner may not bring an action "with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Congress enacted this provision to address the "outsized share" of prisoner litigation filings and to ensure that "the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit."  *Jones*, 549 U.S. at 203-04.  Put another way, the purpose of § 1997e(a) is to "reduce the quantity and improve the quality of prisoner suits."  *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002).  In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures."  *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotations and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court."  *Jones*, 549 U.S. at 211.  The prison's grievance process determines when a prisoner has properly exhausted his

or her claim.  *Id.* at 219 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.").  Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court."  *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999).  The prisoner "may not exhaust his [or her] administrative remedies during the pendency of the federal suit."  *Id.* (citations omitted); *see also Woodford*, 548 US at 95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .").  However, "the PLRA and Federal Rule of Civil Procedure 15 permit a plaintiff to amend his complaint and add claims that were exhausted after the commencement of the lawsuit, provided that the plaintiff's original complaint contained at least one fully exhausted claim."  *Mattox v. Edelman*, 851 F.3d 583, 595 (6th Cir. 2017).  Moreover, "inmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Jones*, 549 U.S. at 216.

## 2.   Relevant Grievances

According to the MDOC Prisoner Step III Grievance Report, Plaintiff filed 6 grievances through Step III.  (DE 27-3 at 3-4.)  Defendants argue that:  **(a)** four of

these do not relate to Plaintiff's claims against them, and, "therefore, do not

exhaust his claims against them[;]" and, **(b)** while the other two grievances

"involve the claims against the Defendants[,]" they do not "properly exhaust"

Plaintiff's claims against them, because "they do not name the Defendants[,]" and

"the grievances were rejected as untimely."  (DE 27 at 13-16.)

Plaintiff seems to agree that the same two grievances are at issue, but he

disagrees that dismissal of his claims against these defendants is warranted.  (DE

28 at 13, 20.)

### a. MDOC PD 03.02.130 ("Prisoner/Parolee Grievances")

Pursuant to its Policy Directive 03.02.130, effective July, 9, 2007, the

administrative remedies available at the MDOC are as follows.  Preliminarily, the

inmate must attempt to resolve any issue with the staff member involved within

two business days of becoming aware of a grievable issue, *"unless prevented by*

*circumstances beyond his/her control . . . ."*  MDOC PD 03.02.130 ¶ P (emphasis

added).  If the issue is not resolved within five business days, the inmate may file a

Step I grievance.  (*Id.* ¶¶ P, V.)  "Dates, times, places, and names of all those

involved in the issue being grieved are to be included."  (*Id.* at ¶ R.)  Unless an

extension is granted, a response is due within fifteen business days of filing the

grievance.  (*Id.* at ¶ X.)  The policy also provides for Step II and Step III grievance

appeals.  (Id. ¶¶ BB-GG.)

The matter is fully exhausted after the disposition of the Step III grievance. MDOC PD 03.02.130 ¶ B ("Complaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy."); *see also Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012) ("A grievant must undertake all steps of the MDOC process for his grievance to be considered fully exhausted.").

### b. JCF-2013-12-2376-27B

Plaintiff filed Grievance ID JCF-13-12-2376-28B on November 25, 2013, while he was housed at LCF. (DE 25 at 7-8 ¶¶ 17-18; DE 25-3 at 3-5; DE 28 at 14.) Plaintiff begins his grievance discussing the May 31, 2013 assault at JCF, explains that he was "locked up in segregation where [h]e remained until [h]e was transferred to [LCF] on June 19, 2013[,]" and further explains that it was not until November 22, 2013 that he became "aware of *why* [he] was assaulted and *who* was at fault[.]" (DE 25-3 at 3-4 (emphases added).)

On December 3, 2013, the grievance was rejected as, among other reasons, "vague," "contain[ing] multiple issues," and "untimely." (DE 25-3 at 6.) Plaintiff completed a Step II Grievance Appeal, but the Step II Grievance Response upheld the Step I response, "with explanation." (DE 25-3 at 7-10.) Plaintiff completed a Step III Grievance Appeal on or about January 24, 2014. (*Id*. at 7, 11-12.) It was

received at Step III on January 28, 2014.  (DE 27-3 at 3.)  Plaintiff claims to have

sent two letters – one dated March 24 and the other dated April 23 – to follow up

on the status of his Step III appeal.  (DE 25-3 at 13-14.)  On April 7, 2014, the Step

II decision was "upheld."  (*Id*. at 17.)

### c.      Plaintiff's counsel's efforts to obtain documents

According to Plaintiff, he "discovered that Pena and Rivera were no longer

reflected on [his] transfer orders[,]" based upon "transfer orders obtained by

Attorney Sutton from Plaintiff's file at LCF[.]"  (DE 25 ¶ 19.)  By a letter dated

March 24, 2015, Attorney Sutton wrote to the LCF FOIA Coordinator to request "a

copy of the memorandum removing the SPONs concerning prisoners Penna and

Rivera from Mr. Mazzola's commitment file."  (DE 25-2 at 32.)  On April 2, 2015,

J. Lyon responded that the requested records "do not exist within the records of

this Department under the name or description provided or by another name

reasonably known to this Department."  (DE 25-2 at 33.)

In April 2015, Attorney Sutton twice wrote to the MDOC's FOIA

Coordinator, initially requesting "a copy of the memorandum removing the

SPONS concerning prisoners Pena and Rivera from Mr. Mazzola's commitment

file[,]" and then making a formal FOIA request for "Transfer Orders involving

Prisoner Clemente Paul Pena . . . ." (*Id*. at 34, 22.)  Ms. Groves's FOIA responses -

dated April 17, 2015 and April 23, 2015 – indicate, respectively, that the requested

records "do not exist within the records of this Department under the name or description provided or by another name reasonably known to this Department[,]" and that portions of the records requested were exempt from disclosure. (*Id.* at 35, 25.) Counsel wrote follow-up letters to Ms. Groves on April 28, 2015 and June 3, 2015, each of which concerned transfer orders missing from the April 23, 2015 response. (*Id.* at 23-24.)

On June 12, 2015, Attorney Sutton wrote separate letters to the Oaks Correctional Facility (ECF) and Newberry Correctional Facility (NCF) FOIA Coordinators, each of which sought documentation regarding the removal of the December 21, 1994 SPON from Plaintiff's commitment file. (*Id.* at 36, 38.) By a letter dated June 17, 2015, Plaintiff's counsel wrote to Defendant Washington regarding the removal of SPONs from Plaintiff's commitment file "some time between the dates of December 9, 2002 and May 12, 2004[.]" (*Id.* at 40-41; DE 25 ¶ 27.) The FOIA responses are dated June 23, 2015, and each indicates that the requested records "do not exist within the records of this Department under the name or description provided or by another name reasonably known to this Department." (DE 25-2 at 37, 39.)

Approximately two months later, by an email dated August 28, 2015, an MDOC Office of Legal Affairs Administrator informed Plaintiff's counsel that "no SPONS were removed from prisoner Mazzola's file." (*Id.* at 42, DE 25 ¶ 29.)

### d.   LCF-2015-10-0887-28E

Although it was dated October 15, 2015, Grievance ID LCF-2015-10-0887-28E was received at Step I on October 14, 2015.  (DE 25 ¶¶ 32-39; DE 25-2 at 4-43; DE 27-3 at 3; DE 28 at 16.)  It refers to and is accompanied by a 4-page addendum (DE 25-2 at 5-8), but the form itself is "directed to the Director's Office[,]" in an attempt "to ascertain the party or parties responsible for somehow arranging that a SPON containing the names of [Mazzola's] mortal enemies . . . disappeared from [his] Transfer Orders sometime between [December 10, 2002] and [May 12, 2004][,]" and alleges that this resulted in the May 31, 2013 assault at JCF.  (*Id*. at 4.)

On October 15, 2015, it was rejected as untimely.  (DE 25-2 at 4, 44.)  Plaintiff completed a Step II Grievance Appeal, but it was rejected as untimely and duplicative.  (*Id*. at 45-48.)  Plaintiff completed a Step III Grievance Appeal, which was received on November 13, 2015.  (*Id*. at 45, DE 27-3 at 3.)  On or about December 22, 2015, he sought the status of his Step III appeal, and by a note dated January 7, 2016, was informed that it had been processed and mailed to him on November 24, 2015.  (*Id*. at 51; *see also* DE 25 ¶ 38, DE 27-3 at 3.)[3]

---

[3] Oddly, the corresponding Step III Grievance Decision indicates it was mailed on December 3, 2015.  (DE 25-2 at 52.)  Moreover, Plaintiff claims that he did not receive a copy of the November 24, 2015 Step III grievance response until February 2016 and filed his original complaint "two months later on April 29, 2016."  (DE 28 at 16-17.)

###### 3.     Improper exhaustion

###### a.     Timeliness

Defendants argue that these grievances do not operate to "properly exhaust" Plaintiff's claims against them, in part because "the grievances were rejected as untimely." (DE 27 at 14-16.) Although the earlier-filed JCF grievance was rejected for multiple reasons, JCF-13-12-2376-28B and LCF-2015-10-0887-28E were each rejected as "untimely." (DE 25-3 at 6, DE 25-2 at 44.)

"[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford*, 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–91 (external footnote omitted). A grievance may be rejected if it "is filed in an untimely manner." MDOC PD 03.02.130 ¶ G(3). "As long as the state clearly rejects a grievance for a reason explicitly set forth in the applicable grievance procedure, 'a subsequent § 1983 claim based on the grievance will be subject to dismissal for failure to properly exhaust.'" *Burnett v. Howard*, No. 2:09-CV-37, 2010 WL 1286256, at *1 (W.D. Mich. Mar. 30, 2010) (quoting *Grear v. Gelabert*, No. 07-cv-203, 2008 WL 474098, at *2 n. 1 (W.D. Mich. Feb.15, 2008)); s*ee also Ann v. McLean*, No. 5:15-CV-11770, 2018 WL 617816, at *5 (E.D. Mich. Jan. 3, 2018) (Patti, M.J.) (a

grievance did not properly exhaust where it "was rejected as untimely[,]" and "that rejection was upheld at Steps II and III."), *report and recommendation adopted*, No. 15-CV-11770, 2018 WL 603892 (E.D. Mich. Jan. 29, 2018) (Levy, J.); *Michowski v. Mathai*, No. 06-11876, 2007 WL 1500333, at *3 (E.D. Mich. May 23, 2007) (Zatkoff, J.) ("the Grievance Coordinators denied all eight of Plaintiff's grievances as untimely at all three steps.  Consequently, it cannot be said that Plaintiff's untimeliness was waived.")

### i. Circumstances beyond Plaintiff's control

Plaintiff's response appears to make two timeliness arguments, each of which is unavailing.  First, Plaintiff argues that "he was prevented from either attempting to resolve his issues or from filing a Step I grievance within the time limit by circumstances beyond his control . . . ."  (DE 28 at 10, 19.)  In support of this argument, he cites MDOC PD 03.02.130 ¶ G(2), which relieves the grievant of having to "attempt to resolve the issue with the staff member involved prior to filing the grievance" if "prevented by circumstances beyond his/her control . . . ." (DE 28 at 12, 17; *see also* MDOC PD 03.02.130 ¶ P.)  However, it is not clear that this portion of the policy extends beyond forgiving a *pre*-grievance attempt at resolution.  Moreover, even if it was interpreted to relieve the deadline to *formally* initiate a grievance at Step I, Plaintiff explains that "the circumstances beyond his control" were "suffer[ing] a vicious assault" and, then, "being placed in punitive

14

segregation for a period of 19 days." (DE 28 at 12.) The May 31, 2013 assault,

followed by what appears to have been 19 days in segregation – whether protective

or punitive - does not explain why Plaintiff waited until <u>November 25, 2013</u> to

complete JCF-13-12-2376-28b, nor does it explain why he waited until <u>October</u>

<u>2015</u> to initiate LCF-2015-10-0887-28E.

### ii.     Valid reason for the delay

Second, Plaintiff notes that an untimely grievance "shall not be rejected if

there is a valid reason for the delay; e.g., transfer." MDOC PD 03.02.130 ¶ G(3).

(DE 28 at 12, 17, 19.) He contends that the "valid reason for delay" is "outlined

*within the grievances* he was finally able to file *with the help of his attorney*." (DE

28 at 13 (emphases added).)

For starters, MDOC PD 03.02.130 does not require a grievant to be

represented by an attorney, and, in fact, the overwhelming majority of prisoner

civil rights cases reviewed by this Court are pursued without counsel, from the pre-

suit MDOC grievance process through judgment. Therefore, Plaintiff could have

filed it himself soon after his June 19, 2013 transfer from JCF. Moreover, even

assuming that Plaintiff's alleged incapacitations at the time of the May 31, 2013

assault warranted counsel's assistance with the filing of a related Step I grievance,

such as JCF-13-12-2376-28B (*see* DE 25 ¶¶ 9-10, DE 25-3 at 3), Plaintiff

represented in writing that his counsel "was hired shortly after June 19, 2013."

(DE 25-2 at 46.)  Thus, it is not clear why it took until November 25, 2013 for his attorney to complete JCF-13-12-2376-28B.

The Court does not doubt that this investigation took time.  Plaintiff explains that he contacted Attorney Sutton to "investigate and attempt to determine *why* [he] was assaulted and *who* was responsible."  (DE 25 at 7 ¶ 15 (emphases added); *see also* DE 25-3 at 4).)  For her part, Attorney Sutton claims her investigation was fraught with "back and forth" communication with "various corrections officials," complicated by "misinformation and heavy redaction," and involved "wading through a mire of obfuscation[.]"  (DE 25 at 7 ¶¶ 15-16, DE 28 at 13-14.) Relatedly, Plaintiff claims his delay is explained in LCF-2015-10-0887-28E at Step 2, where Plaintiff contends, among other things, that he was "attempting to ascertain just *who* within the MDOC was directly responsible for . . . the removal of . . . the SPON information on Mazzola's transfer orders," and that "[w]ithout knowing *who* was at fault, filing this grievance was difficult." (DE 25 at 11 ¶ 34, DE 25-2 at 46 (emphases added), DE 28 at 16.)  Nor does the Court doubt that the documentation - obtained by Plaintiff's counsel and which he claims to have received on November 22, 2013 – helped him "becom[e] aware of *why* [he] was assaulted and *who* was at fault[.]"  (DE 25-3 at 4 (emphases added).)

Nonetheless, as to Plaintiff's claims against the named Defendants here, the length of the investigation and the documents obtained from it do not render

unreasonable the MDOC's rejection of either JCF-13-12-2376-28B or LCF-2015-10-0887-28E as untimely. (DE 25-3 at 6, DE 25-2 at 44.) On June 19, 2013, once he was removed from segregation and transferred to LCF, and having secured the assistance of counsel shortly thereafter, Plaintiff had all the information and tools he needed to timely grieve Defendant JCF Warden Haas for his response, or alleged lack thereof, to Plaintiff's June 3, 2013 letter regarding the conditions of segregation at JCF. (DE 25 at 14-15 ¶ 5, DE 25-5 at 2-3.)

Moreover, Plaintiff completed LCF-2015-10-0887-28E on October 15, 2015, purportedly based on an "ongoing" incident; however, the Step I grievance seeks to determine who removed SPONs from Plaintiff's transfer orders between December 10, 2002 and May 12, 2004, and is directed to the Director's Office. (DE 25-2 at 4 and at 5.) True, the LCF grievance reflects Plaintiff's apparent claim that "the MDOC Director's Office" should note and correct discrepancies when prisoner transfer orders "do not list active SPONS that are in the prisoner's commitment files[.]" (*Compare* DE 25 ¶¶ 41, 32, DE 25-2 at 4-8). Perhaps this was revealed during Plaintiff's "subsequent investigation," which occurred from March through approximately September 2015and which allegedly revealed that Plaintiff's December 9, 2002 transfer order listed Rivera and Pena as SPONs but that his May 10, 2004 transfer order did not (*see* DE 25 at 8 ¶¶ 19, *et seq.*; DE 25-2 at 13-14, 22-25, 32-42).

However, Plaintiff's apparent claim against MDOC *Directors* Caruso, Overton and Washington alleges that they "have failed to ensure that the day-to-day function of their office does not allow for situations to develop that could or would put prisoner's lives in jeopardy." (*Id.* at 13 ¶ 3 and at 12 ¶ 42.) Plaintiff's November 25, 2013 JCF grievance – *filed nearly two years before Plaintiff's October 15, 2015 LCF grievance* – claims he became "aware of why [he] was assaulted and who was at fault[,]" on November 22, 2013. (DE 25-3 at 4.) Thus, Plaintiff could have brought a related grievance naming Caruso, Overton and/or Washington's for their alleged failure(s) well before October 15, 2015.

### b.   Naming the Defendants

The MDOC's grievance policy directs that "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included." (MDOC PD 03.02.130 at ¶ R.) Defendants argue that JCF-2376 and LCF-0887 do not operate to "properly exhaust" Plaintiff's claims against them, because "they do not name the Defendants[.]" (DE 27 at 14-16.) Defendants can advance this argument only as to JCF-13-12-2376-28b, which was rejected for multiple reasons, including a reference to MDOC 03.02.130's Paragraph R (DE 25-3 at 6); they cannot do so as to LCF-2015-10-0887-28E, which was only rejected at Step I as untimely, although the Step II response also mentioned that it was duplicative (DE 25-2 at

44, 48; *see also* DE 28 at 16).[4] *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010) ("When prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as a general rule will we.").

Plaintiff responds that "he did name the individuals responsible for the injuries Plaintiff suffered, or described their positions and responsibilities." (DE 28 at 2, 10.) Unfortunately, these assertions are not accompanied by citations to the grievances at issue, each of which has a multi-page Step I grievance. (*See* DE 25-2 at 4-8, DE 25-3 at 3-5.) Nor do the paragraphs of Plaintiff's complaint that mention JCF-13-12-2376-28b fill in this blank, where he contends this grievance concerned "his transfer to a facility in which Pena was housed as a prisoner." (*See* DE 25 at 8 ¶¶ 17, 18.)

The Court's own review reveals that JCF-13-12-2376-28b's Step I grievance is three pages in length, including an addendum that mentions Attorney Sutton's appeal to the MDOC director for the JCF assault records and names several

---

[4] Plaintiff notes that JCF-13-12-2376-28B was attached as an exhibit to the then-forthcoming LCF-2015-10-0887-28E (DE 27-3 at 66-107). (DE 28 at 17.) The Court is puzzled by the significance of this fact to the exhaustion issue currently before it. Moreover, because Plaintiff insinuates otherwise, to be clear, any failure by Plaintiff to name a Defendant in either of the Step I grievances at issue here is not, for purposes of exhaustion under 42 U.S.C. § 1997e(a), cured by Plaintiff identifying them in later filed matters in this case, such as Plaintiff's various complaints (DEs 1, 7, 24 or 25) or his January 10, 2018 response (DE 28 at 10-11). (DE 28 at 17-18.)

individuals, including JCF Warden "Hass" and "any other JCF official who has been designated to ensure that all transfers to [JCF] comply with" MDOC PDs 03.03.110 and 05.01.140.  (DE 25-3 at 4; *see also* DE 25-3 at 9 [Step II], DE 25-3 at 12 [Step III].)  In the Undersigned's view, this only provides enough specificity to identify Warden Haas.  However, even if, *arguendo*, Plaintiff could show that the MDOC improperly rejected JCF-2376 as lacking the detail required by Paragraph R of MDOC PD 03.02.130 as to Defendant Haas or any other defendant, the MDOC reasonably rejected this grievance as untimely, and Plaintiff has not shown "a valid reason for the delay[.]"  MDOC PD 03.02.130 ¶ G(3).

### c.    Conclusion

Finally, while the grievance responses to LCF-2015-10-0887-28E are procedurally-based (*see* DE 25-2 at 44, 48, 52), the Court notes that the Step II response in JCF-2013-12-2376-27B is "with explanation."  (DE 25-3 at 10.) "When an administrative agency addresses an inmate's grievance on the merits, then the agency has found that the inmate satisfied the required critical procedural rules."  *Rickman v. Michigan Dep't of Corr.*, No. 1:07-CV-197, 2008 WL 907469, at *8 (W.D. Mich. Mar. 31, 2008).  In the Undersigned's opinion, the Step I and Step II responses each point out that there is "no evidence" associating a "specific prisoner" with the alleged "assault."  (DE 25-3 at 6, 10, 17.)  Moreover, the further detail provided in the latter response simply expands upon the reasoning set forth

in the initial, procedural denial; this includes the comment that "JCF staff were not involved in the assault or found to be in any violation of policy and procedure, related to the incident[,]" which, in context, supplies the reason why the MDOC is requesting further information.  (DE 25-3 at 10.)  In other words, at both Steps, the MDOC properly rejected the earlier grievance for procedural deficiencies, namely, untimeliness and lack of specificity.  The responses do not address the merits of what did or did not occur or the propriety of anyone's actions.

Thus, even if, as Plaintiff argues, he is not "[a] prisoner who does not want to participate in the prison grievance system . . . [,]" *Woodford*, 548 U.S. at 95, and had a right to rely upon MDOC PD 03.02.130 ¶¶ G(2),(3) (*see* DE 28 at 11-12), it remains that Plaintiff's untimely grievances – as to which he has not shown either "a valid reason for the delay" or "circumstances beyond his[] control" – do not properly exhaust his deliberate indifference claims against former Directors Overton and Caruso, current director Washington, and then-Warden Haas.

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.*  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.*  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: June 13, 2018                    s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE

## <u>Certificate of Service</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on June 13, 2018, electronically and/or by U.S. Mail.

s/Michael Williams         
Case Manager for the
Honorable Anthony P. Patti
